UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | Case No. 21-CR-20490 |
| ) | Hon. Victoria Roberts |
| ANDRE SPIVEY, ) | |
| ) | |
| Defendant ) | |

## DEFENDANT'S PRE-SENTENCING BRIEF AND MOTION FOR DOWNWARD DEPARTURE FROM SENTENCING GUIDELINES

NOW COMES, Defendant, Andre Spivey, by and through his attorney, Elliott S. Hall, and in this pre-sentencing brief provides the following factual background and legal authority in support of his request for a downward departure from sentencing guidelines, specifically, a sentence of probation only. Defendant pled guilty on September 10, 2021, to one charge of conspiracy to commit federal program bribery under 18 USC §§ 371 and 666.

A.   FACTUAL BACKGROUND

   1.   Personal Information

Mr. Spivey was born February 19, 1974, in Detroit, Michigan. He attended Morehouse College in Atlanta, Georgia, graduating in 1996 with a Bachelor of Arts degree. He received a Master of Divinity from Colgate Rochester Divinity School in Rochester, New York in 2000. Mr. Spivey continued his education achieving a Master of Science from Central Michigan University in Mt. Pleasant, Michigan in 2012 and is currently enrolled at Wayne State University Law School. His desire to actively serve God led him to receive a license to preach in 1992 from the African Methodist Episcopal Church, Itinerant Deacon Ordination in 1995 and Itinerant Elder Ordination in 1997. He was pastor of St. Paul A.M.E. Church in Detroit for 14 years, resigning in 2018 to attend law school.

Mr. Spivey married Reeshemash Spivey on June 10, 2000, in Detroit, Michigan. They have two children, Andre L. Spivey, II who is a sophomore at his father's alma mater, Morehouse College, where he is a student athlete; and their daughter Kendall Spivey, who is a senior, student-athlete at Mercy High School who will attend Villanova University in the fall of 2022 on an athletic scholarship. The family resides in a modest home in Detroit.

Mr. Spivey's career path began with his service to the A.M.E. Church earning very modest salaries as the Senior Pastor at Pleasant Valley A.M.E. Church in Bellville, Michigan in 2000; then a promotion to Saunders Memorial A.M.E. Church in Detroit in 2003; and then achieving another promotion to the historic St. Paul A.M.E. Church in Detroit. Mr. Spivey had the second longest tenure as pastor in the church's history. He proudly led the St. Paul congregation during the church's 100th anniversary in 2017. During his assignment at St. Paul, he hosted numerous local and national speakers including Former U.S. Secretary of Transportation Rodney Slater, former U. S. Surgeon General Joycelyn Elders, Congresswoman Maxine Waters, Congressman Hank Johnson, former New York City Mayor Bill de Blasio, Wayne County Community College Chancellor, Dr. Curtis Ivery and University of Detroit Mercy, President Dr. Antoine Garibaldi. He currently serves on the ministerial staff at Oak Grove A.M.E. Church in Detroit. Divinity vocations require many sacrifices—many hours away from home, the pay is low, and the expectation to be a spiritual and moral example to others is high. To supplement the family income and to fulfill his desire to further serve his fellow Detroiters, Mr. Spivey entered the world of public service when he ran and was elected to the Detroit City Council in 2009. This was a major decision for Mr. Spivey and his wife, as public service is an equally demanding career choice requiring many hours of time away from home. Mr. Spivey was re-elected to City Council for two more terms in 2013 and 2017.

He set his sights even higher towards a legal career to prepare for life after his service on the City Council. Upon acceptance to Wayne State Law School, he resigned as pastor of St. Paul A.M.E. Church to meet the demands of law school studies and continued to serve as a member of City Council.

Mrs. Reeshemash Spivey has been a strong supporter of her husband's career choices—they are a team. And, as all parents desire, Mr. and Mrs. Spivey wanted to provide a life for their children that offered greater opportunities for success than they had. They wanted to send both of their children to private schools and support their interests in extra-curricular activities. As tuition bills and family expenses mounted, including Mr. Spivey's own tuition expenses for law school, beginning in 2016 Mr. Spivey admittedly resorted to making private requests of close friends and associates for loans, rather than managing his personal finances more responsibly. He did not seek assistance from members of his family due to his pride and persona that he was a strong male member of his extended family who had achieved success through hard work and education.

Mr. Spivey was introduced to the Confidential Source (CS) in 2008 when he campaigned for a seat on the Detroit City Council. The CS frequently attended campaign events and contributed to Mr. Spivey's campaign. There were times when the CS sought counsel from Mr. Spivey in his role as a cleric. As the years passed, Mr. Spivey innocently, and in hindsight, naively, believed his relationship with CS was as friends and outside of city business. As expenses mounted and his income decreased when he resigned as pastor of St. Paul AME Church in 2018, Mr. Spivey became more entrenched in a cycle of financial distress. His lack of discernment between what he thought was a trusted confidant/acquaintance versus a conflicted individual doing business with the City has led him to this day before a federal court judge in a

criminal case. He made innocent, but poor, choices that he now understands crossed legal boundaries. He takes full accountability for his actions.

2. Factual Background Regarding Incident for Which Defendant Plead Guilty

The Plea Agreement acknowledges Mr. Spivey did not make any official act that aided CS or CS' towing business. More importantly, however, a thorough comparison of the transactions at issue and Mr. Spivey's official acts shows he repeatedly voted *against* the CS' interests. Mr. Spivey respectfully requests this Honorable Court to note the following timeline of events (Exhibit A includes official City Clerk records):

- Mr. Spivey met the CS in 2008 while campaigning for City Council.

- Mr. Spivey first approached the CS for a $1,000 loan on July 9, 2016, to help pay taxes after unsuccessful efforts to obtain a loan from other close friends. The CS obliged. On September 1, October 20, November 9, and December 1, 2016, Mr. Spivey joined his colleagues in unanimous votes to approve four contracts awarded to the CS' *competitors*.

- Mr. Spivey approached the CS again on December 1, 2016 for a $1,200-$1,500 loan to contribute to expenses for his mother's retirement party. The CS obliged. Mr. Spivey intended to repay the loans, but when the time came to repay as promised, he was unable to do so.

- On February 6, 2017, Mr. Spivey joined his colleagues in a unanimous vote in favor of a land vacation that favored one of the CS' *competitors*.

- On March 17, 2017, Mr. Spivey voted in favor of a payout to one of the CS' *competitors* pursuant to the City Corporation Counsel's recommendation to resolve a legal matter.

4

- On April 27, May 18, May 25, June 1, June 8, July 14, August 1, September 7, and November 30, 2017, Mr. Spivey joined his colleagues in unanimous votes to approve multiple contracts awarded to the CS' *competitors*. Only one contract for the CS' business came before City Council after Mr. Spivey sought loans from the CS; that is, on May 25, 2017, and Mr. Spivey joined his colleagues in a unanimous vote to approve the Administration's one-year renewal of an existing contract that had been in place since 2014, which would now expire in June 2018.

Sometime in 2017, the CS began working with the government after the FBI approached the CS concerning corruption within City government as it relates to the towing industry. The CS began recording meetings with Mr. Spivey.

- February 6, 2018, Mr. Spivey joined his colleagues in a unanimous vote to approve settlement of lawsuit by one of CS' *competitors* against the City of Detroit, pursuant to the City Corporation Counsel's recommendation.

- On February 17, 2018, Mr. Spivey requested a $1,500 loan for taxes and bills and when they met on February 18th, the CS provided Mr. Spivey with $2,000—an extra $500. At that time, the CS recorded himself advising Mr. Spivey that a City contract for another company he owned was taken away due to litigation with the City. Mr. Spivey merely offered to look into the matter, although he had no control over the Administration's decision whether to award or rescind a contract benefiting the CS' companies.[1]

- On June 15, June 22, June 28, July 5, and October 24, 2018, Mr. Spivey joined his colleagues in unanimous votes to approve contracts awarded to CS' *competitors*.

---

[1] The Mayor's Administration did not bring further contracts/renewals for any of the CS' businesses to City Council for vote.

5

- On October 26, 2018, the CS and an undercover agent, posing as a business associate of the CS, met with Mr. Spivey and recorded the meeting. Mr. Spivey had first been introduced to the business associate on September 27, 2018, at a fundraiser for another politician. During the October 26th meeting, the CS and undercover agent each gave Mr. Spivey $1,000 in cash and then asked for help to get into the towing rotation after the Mayor's Administration rescinded a contract with the CS' business earlier in 2018 when it countersued the City (*supra*). The CS also mentioned wanting to secure work with the Municipal Parking Department. Mr. Spivey had absolutely no control, influence or input into the towing rotation or which businesses were awarded contracts with the Municipal Parking Department. Further, Mr. Spivey had not asked for financial assistance, but needed the funds. He became concerned about the unsolicited offer of money, so he wrote a draft text message on his cell phone that he showed to the CS asking if he could trust the business associate/agent. Given Mr. Spivey's longstanding relationship with the CS since 2008 and trust that the CS kept the loans confidential, Mr. Spivey wondered if the business associate would keep things confidential as well. The CS assured Mr. Spivey the associate was trustworthy.
- On November 7, 2018, Mr. Spivey joined his colleagues in a unanimous vote to approve a contract awarded to one of the CS' *competitors*.
- On December 4, 2018, Mr. Spivey joined his colleagues in a unanimous vote to approve a payout to one of the CS' *competitors* to resolve a litigated matter, pursuant to a recommendation by the Corporation Counsel.
- On February 20 and 28, Mr. Spivey joined his colleagues in unanimous votes to approve contracts awarded to the CS' *competitors*.

- On April 9, 2019, the CS met with Mr. Spivey and gave him $2,000, recording the meeting. The CS made another request for help to have his contract restored and the litigation matter resolved. Mr. Spivey merely offered again to look into the matters, although he had absolutely no control over the Administration's award of contracts or litigation strategy.

- On April 16, 2019, Mr. Spivey joined his colleagues in a unanimous vote to debar four towing companies from doing business with the City, based on results of an Office of Inspector General investigation. At that time, the CS' business was not implicated in wrongdoing.

- On April 29, 2019, Mr. Spivey joined his colleagues in a unanimous vote in favor of a resolution to fund an appropriation for the Detroit Police Department's towing and storage operations to enhance *oversight and monitoring of towing activities*, such as the CS' business.

- On July 2, 2019, Mr. Spivey requested another $2,000 loan and the CS obliged. The meeting was audio and video recorded and the CS asked for Mr. Spivey to help with restoring his contract. Mr. Spivey offered to contact the Procurement Department to inquire further, although he had no control or influence over decisions made by the Procurement Department.

- On May 14, 2019, Mr. Spivey joined 7 of his colleagues and voted in favor of a legal payout to one of CS' *competitors*, pursuant to the Corporation Counsel's recommendation.

- On June 5 and 19, 2019, Mr. Spivey joined his colleagues in unanimous votes in favor of contracts awarded to the CS' *competitors*.

7

- Mayor Duggan's Administration introduced an amended City Ordinance related to towing on July 14, 2019. (Exhibit B) Mr. Spivey voted in favor of introducing the ordinance along with five other Council Members. *The ordinance added more oversight by the City and put numerous restraints and new regulations on towers.*

- On November 1, 2019, Mr. Spivey joined his colleagues in a unanimous vote in favor of a contract awarded to one of the CS' *competitors.*

- On November 25, 2019, Mr. Spivey requested another $1,000, but when the CS offered $2,000, Mr. Spivey accepted the funds.

- On January 22, 2020, Mr. Spivey asked the CS for assistance for an upcoming fundraiser on February 21, 2020, to be repaid from donations made at the door of the event. The CS gave a $10,000 company check and $4,000 in blank money orders.

- On February 21, 2020, with Mr. Spivey's approval, one of his staffers asked the CS for a $12,000 loan to pay the entertainer at the fundraiser because the person would only take cash. The loan would be repaid from fundraiser donations. The CS provided $8,000 and the undercover agent provided $4,000.

- On May 20, 2020, Mr. Spivey voted in favor of bonds allowing the City to implement a fully functional tow yard, which allowed DPD to make improvements to a City-owned tow yard in order to tow and store additional vehicles. This would cut into the percentage of tows and reduce revenue for the private towers, such as the CS' businesses—ergo a major vote *against the CS' interests.* (6 – 3 vote)

- On June 22 and June 29, 2021, Mr. Spivey joined his colleagues in unanimously voting in favor of ten different towing contracts awarded to the CS' *competitors.*

- On July 14, 2020, Mr. Spivey joined his colleagues in a unanimous resolution to introduce and set for a public hearing, amendments to the City's towing ordinance that substantially transformed the towing process to prevent corruption and *against the CS' interests*.[2]

3. Defendant's Conduct Did Not Threaten the Harm Sought to be Prevented by the Law

The factual background highlights a very important point—Mr. Spivey's actions did ***not*** compromise the integrity of the legislative deliberative process in any manner. It is essential for this Honorable Court to note that *every* matter brought before the City Council for a vote from 2016 to 2019 that related to the towing industry was a matter brought to the Council upon a *recommendation for approval from* the Mayor's Administration, the Council's Legislative Policy Division/City Planning Commission, and/or the City's Corporation Counsel. Mr. Spivey always voted in favor of the recommended zoning matter, litigation resolution, vendor debarment or ordinance amendment. Further, City Council unanimously approved each towing contract. Mr. Spivey's vote never changed and was never a deciding factor in any towing matter. He never took an official act to assist the CS or the CS's business—in fact, except for one vote to unanimously approve the Administration's request to amend the CS' business' contract, ***all of Mr. Spivey's votes were against the CS' business interests***.

Mr. Spivey acknowledges his acceptance of the loans and other payments were illegal gratuities even though his actions did not directly compromise the integrity of the legislative deliberative process. The Guidelines recognize that departure is permissible where the "conduct may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue." USSG § 5K2.11

---

[2] City Council approved the ordinance amendments after Mr. Spivey's resignation on September 29, 2021.

9

4. Crimes to Which Defendant Pleads Guilty Require a Sentence "Sufficient But Not Greater than Necessary"

Defendant Spivey pled guilty to 18 USC §§ 371 *Conspiracy to commit offense or to defraud United States*, and 666 *Theft or bribery concerning programs receiving Federal funds*. The agreed sentencing guideline range is up to five (5) years imprisonment; a fine up to $250,000; and/or three (3) years of supervised release. However, this guideline sentence conflicts with 18 USC 3553(a)'s directive to impose a sentence "sufficient but not greater than necessary." The Court is directed to consider the purposes of sentencing set forth in subsection § 3553(a)(2), which states:

> (2) the need for the sentence imposed—
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In light of *United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005)* and *Gall v United States*, 128 S Ct 586 (2007) and their progeny, there are a multitude of factors, more fully set out below, that allow this Court to sentence Mr. Spivey to probation, as opposed to restitution or incarceration, which is reasonable and will achieve the purposes for which sentence is to be imposed.

B.    LEGAL AUTHORITY SUPPORTING DOWNWARD DEPARTURE OF SENTENCE

1. Guideline Sentence Conflicts with 18 USC 3553(a)'s Directive to Impose a Sentence "Sufficient But Not Greater Than Necessary"

The sufficiency of a sentence is a very fact-based determination and case law provides a multitude of examples of the factors this Honorable Court may consider, including: personal history and characteristics, lack of criminal record, being a caregiver to children and supporter of

a family, loss of business opportunities and employability, and a low recidivism risk. *U.S. v Muniz-Nava*, 524 F3d 1137 (10th Cir 2008) (upheld sentence of one year and one day as reasonable for defendant convicted of possession with intent to distribute 100 grams of heroin with guideline range of 46-57 months, where there were serious familial obligations, no prior criminal record, and defendant exhibited low recidivism risk); *U.S. v Rowan* 530 F3d 379 (5th Cir, 2008) (Affirming district court's determination that the §3553(a) factors as a whole warranted a sentence of 60 months' probation for possession of child pornography rather than a guideline term of 46-57 months ); *U.S. v Redemann,* 295 F Supp 2d 887 (E.D. Wis 2003) (court departed downward two levels in bank fraud case in part because the defendant suffered tremendously in personal and professional relationships, fined in a civil enforcement action against him, and barred from participating in any capacity in a federally-insured financial institution); *U.S. v Gaind*, 829 F Supp 669 (S.D.N.Y. 1993) (Defendant convicted for false statements in connection with contracts for testing material for the Environmental Protection Agency and related crimes. Court departed downward from sentencing guidelines because the destruction of the defendant's business had already achieved to a significant extent some of the objectives required to be sought through the sentencing process.)

In *Gall v United States*, 128 S Ct 586 (2007), the United States Supreme Court rejected a rule that would require "extraordinary" circumstances to justify a sentence outside the Guidelines range. An appellate court reviewing a trial court's sentencing order must "consider the extent of the deviation [from the guidelines] and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall,* 128 S Ct at 597. The Supreme Court embraced a very fact-dependent, case-by-case analysis with regard to sentencing.

The facts of the *Gall* decision are in many ways similar to the facts before this Court. The District Court's rationale, upheld by the United States Supreme Court, for imposing a sentence of thirty-six (36) months *probation* for being a part of a conspiracy to distribute ecstasy, cocaine, and marijuana is completely applicable to this case.

Brian Gall, a second-year college student at the University of Iowa and drug user, joined an ongoing enterprise distributing "ecstasy." For seven months, Gall accepted pills from the main distributor and delivered them to co-conspirators who sold the pills to customers. Gall received over $30,000. After seven months, he told the main distributor and his co-conspirators that he no longer wanted to participate. He graduated from college, stopped using all drugs, and moved out of state where he became gainfully employed. After Gall moved out of state, federal law enforcement agents questioned him about his involvement in the ecstasy distribution conspiracy. Gall admitted his limited participation. When he received notice of the indictment, he moved back to Iowa and surrendered to the authorities. While free on his own recognizance, Gall started his own business in the construction industry.

Gall entered into a plea agreement, and the pre-sentencing report recommended a sentencing range of 30 to 37 months of imprisonment. The District Judge sentenced Gall to probation for a term of 36 months. The Court ruled that defendant's explicit withdrawal from the conspiracy almost four years before the filing of the Indictment, the defendant's post-offense conduct, especially obtaining a college degree and the start of his own successful business, the support of family and friends, lack of criminal history, and his age at the time of the offense conduct, all warranted probation. *Id* at 593. The Court also explained why the sentence of probation reflected the seriousness of Gall's offense and no term of imprisonment was necessary:

> Any term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who, the Court has found, *understands the consequences of his criminal conduct* and *is doing everything in his power to forge a new life. The Defendant's post-offense conduct indicates neither that he will return to criminal behavior nor that the Defendant is a danger to society. In fact, the Defendant's post-offense conduct was not motivated by a desire to please the Court or any other governmental agency, but was the pre-Indictment product of the Defendant's own desire to lead a better life. Id.* (Emphasis added.)

In a post-*Gall* decision, *U.S. v Howe*, 543 F3d 128 (3d Cir 2008), the District Court sentenced defendant who had been found guilty on two counts of mail fraud to two years of probation and 3 months of home confinement, despite a guideline range of 18 to 24 months. The Government appealed. The Third Circuit noted that the District Court relied on no fewer than seven reasons to justify its downward variance. Howe: (1) "led an honorable and lawful life until this point" and had no prior criminal history; (2) "served in the U.S. Military for 20 years"; (3) was a "well-regarded member of [his] community"; (4) "regularly attend[s] church"; (5) was a "devoted husband, father, and son"; (6) made but an "isolated mistake" in committing his crime; and (7) was remorseful at sentencing. *Id*, at p. 137

The Third Circuit held that the factors in their totality reasonably supported the sentence imposed—specifically noting the importance of deterrence or the avoidance of unwarranted sentence disparities under §3553(a)(6). Further, the Court felt other defendants would receive the message that prison time could be imposed absent meaningful circumstances warranting a downward departure. *Id.*

Accompanying this brief are hundreds of letters of support for Mr. Spivey attesting to his character and their confidence that he is deeply remorseful for his actions. (Exhibit C) On October 3, 2021, Mr. Spivey's pastor allowed him to address the congregation to apologize and seek their forgiveness. He has received overwhelming support. Most importantly, Mr. Spivey is not merely "sorry he got caught," he is sorry that he breached the trust of his position as a

13

member of the City Council and dishonored his position as a member of the clergy. He feels awful that he brought embarrassment to his family, the residents he represented, his former staff, friends and supporters. He knows that people worked very hard campaigning for him and expected him to do what is right. This conviction negated the good work he had done over the past 21 years both as a clergyperson and an elected official.

Similar to *Gall*, Mr. Spivey's criminal actions were limited in nature because only one vote could potentially be viewed as part of a conspiracy—the renewal of an existing contract to CS' business on May 25, 2017. Again, this was a unanimous vote based upon a contract award from the Mayor's Administration. All of Mr. Spivey's other votes regarding towing matters were *against the CS's interests*. When federal authorities approached Mr. Spivey, he cooperated and entered into a plea agreement. He has shown sincere remorse for his actions. A sentence of probation is not only merited, it is well-supported by the *Gall* decision.

2. Defendant Cooperated with Authorities to Investigate and Prosecute Others

In 2020, Mr. Spivey and his attorney met for several months with authorities and cooperated extensively to help investigate and eventually prosecute others.

The Guidelines at U.S.S.G. §5K.1.1 provides a list of factors relating to the assistance itself that the sentencing court should consider, including: the usefulness of the assistance, as interpreted by the Court and as viewed by the Government; the truthfulness of the defendant's information or testimony; the nature and extent of the cooperation; any risk or injury suffered by the defendant or his family; and the timeliness of the assistance. *See U.S. v Tenzer*, 213 F3d 24 (2d Cir. 2000)

Even where cooperation does not result in prosecution of another, the Court is not precluded from considering the defendant's arguments for departure. *U.S. v Kaye*, 140 F3d 86

14

(2d Cir. 1998) (Defendant moved for departure based on cooperation or assistance to government authorities that did not involve investigation or prosecution of another, *held* that Section 5.K.0 applied and court was not precluded from considering defendant's arguments.) *U.S. v Fernandez*, 443 F3d 19 (2d Cir. 2006) (a judge should consider that a defendant made efforts to cooperate, even if those efforts did not yield a government motion for departure.)

   3. Defendant Spivey Seeks a Sentence Commensurate with Sentences of Other Defendants Involved in the Probe of Corruption by City Council Members

Under §3553(a)(6), the Court must take into account when sentencing a defendant "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The analysis of this factor calls for an out-of-Guidelines adjustment. "There is something troubling about the extent to which differences in sentence [are] driven not by differences in the crime, but by the happenstance of the way the government indicted . . . and who ran to cooperate first." *U.S. v Jaber*, 362 F. Supp. 2d 365 (D. Mass. 2005)

In the continuing probe of corruption at City Hall associated with the Detroit City Council, the federal government dropped charges against Council Member Gabe Leland when he pled guilty to misconduct in office in Wayne County Circuit Court *for accepting $15,000 specifically in exchange for a vote on a land deal.* He received two and a half years of probation.

Under §3553(a)(6), Mr. Spivey should receive a sentence well below the Guidelines, as did Council Member Leland, "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Gall*, 128 S. Ct. at 600; *Kimbrough v U.S.*, 128 S. Ct. 558 (2007); *Rita v U.S.*, 127 S. Ct. 2456 (2007); *Cullen v U.S.*, 194 F 3d 401, 408 (2d Cir 1999)(sentencing court could plausibly conclude that extremely divergent sentences would undermine the accepted notion that similar conduct should be punished in a somewhat similar manner).

4. <u>Imprisonment Would Cause Extreme Hardship to Defendant's Family</u>

Mr. Spivey has very limited income since his resignation from City Council in September. He will not lose his ordination status, however, in consultation with his pastor they agreed he would remain on the payroll at Oak Grove A.M.E. Church until his legal matter is decided. He has taken a less public role working behind the scene doing administrative duties. He is not preaching nor teaching. Even though both children have received athletic scholarships, it does not cover all of their college expenses and their parents have and will continue to make up the difference. Because of intermittent salary decreases during the COVID-19 pandemic, Mrs. Spivey's income alone from working in the automotive industry will not adequately cover their children's college expenses and normal household expenses.

Although hard economic times have caused many families to suffer the same lack of income and access to employment, especially due to the COVID-19 pandemic—it is fair to state that the stigma of Mr. Spivey's conviction will cause hardship to his family for many years to follow, even if he receives a sentence of probation. However, probation provides sufficient punishment that also allows him to continue with needed educational and vocational training so he is able to support his family. Imprisonment would literally extend his punishment well beyond his release. Family members will provide as much support as possible; but a gainfully employed husband and father is the most crucial element of the family's survival. In addition to his part-time income at Oak Grove A.M.E. Church, Mr. Spivey was employed at Amazon from July 2019 through September 2021 and has been working at Instacart since June 2021.

His guilty plea to the crime of bribery also means he is forever disqualified to hold any public office, trust or appointment, pursuant to Michigan Compiled Law 750.118. At 47 years old, he is literally starting at square one to try to make a living for his family. Forever changed

by this situation, his extremely limited options to earn a living will be a constant reminder and punishment in itself for his crime. He would still like to finish law school and use his degree to teach at a law school or university. He understands it is unlikely he will pass the Character and Fitness review to be able to practice law.

In addition to the economic hardship to his family, Mr. Spivey's daughter will suffer great emotional distress if her father is imprisoned during her senior year in high school and as she transitions to college. Mr. Spivey, his wife and daughter received threatening and demeaning text messages and emails since his arrest and conviction were reported in the media, including shocking emails of a sexual nature regarding his wife and teenage daughter. (Exhibit D) He is hoping to be with his wife to provide emotional support, guidance and protection for their daughter. Also, their son is on his college football team and they would like to support him and attend his games together. He hopes to continue working on the ministerial staff at Oak Grove A.M.E. Church and serve the community in northwest Detroit.

These factors are appropriate for the Court to consider in considering a downward departure from the Guidelines. *U.S. v Gardellini*, 545 F3d 1089 (DC Cir 2008) (upholding sentence of probation and a fine for defendant convicted of filing false tax returns because defendant had accepted responsibility, a minimal risk of recidivism, had already suffered substantially and been treated for stress, and the only real deterrent in these cases are the efforts of prosecutors to enforce the laws, not harsh prison sentences); *U.S. v Samaras*, 390 F Supp 2d 805, 809 (E.D. Wis. 2005)(where defendant convicted of fraud, sentence below guideline warranted in part because "as a consequence of his conviction and sentence, defendant lost a good public sector job, another factor not considered by the guidelines); *U.S. v Redemann*, 295 F.

17

Supp. 2d 887, 894-97 (E.D. Wis. 2003) (departing downward where defendant suffered collateral consequences from conduct, including loss of business.)

The purposes of §3553(a)(2)(B) and (C) have been met. The life and career-changing events of his actions have, indeed, deterred Mr. Spivey from engaging in any form of criminal conduct, and the public is protected from him committing any further crimes. Any benefit to the public of incarcerating Mr. Spivey is far outweighed by the harm imprisonment would cause his wife and children.

5. <u>Probation Will Sufficiently Punish Defendant Spivey for Offense Committed</u>

In *Gall*, the United States Supreme Court noted that probation was not "an act of leniency," rather it is a "substantial restriction of freedom:"

> [Gall] will have to comply with strict reporting conditions along with a three-year regime of alcohol and drug testing. He will not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court. Of course, the Defendant always faces the harsh consequences that await if he violates the conditions of his probationary term." *Id.*

Offenders on probation are subject to several standard conditions that substantially restrict their liberty. See *United States v. Knights, 122 S. Ct. 587 (2001)* ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (quoting *Griffin v. Wisconsin, 107 S. Ct. 3164 (1987))*.

C.     A FAIR AND JUST SENTENCE SHOULD BE IMPOSED BASED UPON THE TOTALITY OF THE CIRCUMSTANCES

Mr. Spivey's actions from the date federal authorities first contacted him reflect his respect for the fact that he committed a serious offense. He immediately cooperated with federal authorities regarding his own crime and was prepared to provide substantial cooperation in the investigation of other crimes. This experience surely capped Mr. Spivey's brief foray in the

world of white-collar crime. He is a decent man who made a very bad choice. Although Mr. Spivey's actions were not a *quid pro quo* act of bribery; and even though his actions did not directly compromise the integrity of the legislative deliberative process, Mr. Spivey acknowledges his acceptance of the loans and unsolicited payments were an illegal gratuity. But for Mr. Spivey's status as a local municipal official versus a federal official, he would have been charged with the lesser crime of illegal gratuity.

Defendant respectfully requests that this Honorable Court impose a sentence of probation, which follows the standard under 18 USC §3553(a) that the sentence be "sufficient but not greater than necessary." Imprisonment will cause an extreme hardship on this wife and children. He has been sufficiently punished by the consequences of his guilty plea—professionally, financially, and personally.

As the United States Supreme Court so eloquently cited in the *Gall* opinion:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

*Gall,* 128 S Ct at 597

Mr. Spivey respectfully requests this Honorable Court to view him as a unique individual who profoundly understands the significance of his human failing.

Respectfully submitted,

ELLIOTT HALL, PLLC

_____
Elliott S. Hall  (P14546)

Dated:   January 11, 2022